UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 21-147(3) (ADM)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | GOVERNMENT'S SENTENCING |
| v. | ) | MEMORANDUM |
| | ) | |
| GERYIELL LAMONT WALKER II, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its undersigned attorneys, hereby respectfully submits its position and memorandum on sentencing. In accord with the Plea Agreement, the United States recommends a sentence of imprisonment of 78 months, the low-end of the applicable Guidelines range, as a sentence that is sufficient, but not greater than necessary, to comport with the § 3553(a) sentencing factors.

## **RELEVANT FACTS AND PROCEDURAL BACKGROUND**

The United States agrees with, and incorporates by reference, the facts from the "Offense Conduct" section of the PSR, ¶¶ 6-17, as well as those facts from the Plea Agreement (ECF 133, ¶ 2).

Between at least mid-April 2021 through May 2021, the defendant conspired with his two co-defendants (Elwood and Jackson) to repeatedly straw-purchase multiple firearms from various licensed dealers in the greater metro area and resell them to others— including known felons and gang members. The overall year-long conspiracy involved the straw purchase of 95 firearms, with the defendant aiding and abetting the straw purchase of at least 65 firearms between mid-April and May 2021 alone. (PSR ¶¶ 7, 17) Indeed,

the defendant told law enforcement agents that they conducted the straw-purchasing scheme so many times that he could not remember how many firearms had been straw purchased. (PSR ¶ 13; ECF 133, ¶ 2.g.)

As part of the scheme, the defendant would place orders for firearms he received from others—including drug dealers, gang members, and known felons—with Jackson, who would then arrange the straw-purchases with Elwood, who had a permit to carry, and would use that permit to purchase the various firearms ordered, as arranged through Jackson. (PSR ¶ 13) The terms of the agreement included a fee of $100 for each straw-purchased firearm, paid by the defendant to Jackson and Elwood for facilitating and providing the illicitly obtained firearms. The defendant would often front the purchase money to Jackson and Elwood and place orders for specific firearms.

During these arranged straw purchases, Elwood, with the agreement and knowledge of Jackson and the defendant, would intentionally lie and mislead the licensed dealers by averring on the necessary purchase forms that she was the actual purchaser of the firearms, when in fact she, Jackson, and the defendant all knew that others (including felons) were the true purchasers of the firearms. (PSR ¶¶ 8, 13, 17) After placing an order with Jackson, the defendant would often travel together with Elwood and Jackson to the various gun stores, and first enter the store alone to identify the firearms he wanted purchased. (PSR ¶ 13; ECF 133, ¶ 2.f.) Elwood would then enter the store, falsely fill out the necessary paperwork, straw purchase the specific firearms selected, and then provide the straw-purchased firearms to the defendant in exchange for the $100-per-firearm fee.

When federal and local law enforcement arrested the defendant and his two co-defendants on May 30, 2021, they had just straw-purchased an AR-15 semiautomatic pistol, two 9mm semiautomatic pistols, three boxes of high-caliber ammunition, and a 100-round AR-15 high-capacity magazine for over $1750 cash. (PSR ¶ 10) The defendant was also in possession of a loaded Glock .45-caliber semiautomatic firearm, which he had left in the vehicle and which had been previously straw-purchased by Elwood for the defendant. (PSR ¶ 11; ECF 133, ¶ 2.j.)

During a recorded post-Miranda interview, the defendant admitted to the straw-purchasing scheme, claiming that he did not have the proper identification to purchase firearms and that he was a regular daily user of marijuana, having entered the gun stores during some of these arranged purchase transactions while under the influence of marijuana. The defendant admitted that he would in turn sell the firearms that he purchased from his co-defendants to others, including known felons. When told that some of the straw-purchased firearms were being used for criminal acts, the defendant stated he "did not care." (PSR ¶ 13) For the May 30, 2021 arranged purchase transaction, the defendant admitted that he had arranged and planned to buy a Ruger 9mm handgun through his co-defendants and then provide the firearm to another person he knew was prohibited from legally purchasing and possessing firearms, because the person was a "felon." (ECF 133, ¶ 2.h.)

To date, only about 18 firearms of the 95 straw-purchased have been recovered by police—often in possession of prohibited persons or at crime scenes.

3

In June 2021, a grand jury returned a five-count Indictment, charging the defendant and his co-defendants with conspiracy to make false statements during firearms purchases, in violation of 18 U.S.C. § 371 (Count 2), and three counts of making false statements during firearms purchases, in violation of 18 U.S.C. §§ 2, 922(a)(6), and 924(a)(2) (Counts 3 – 5). (PSR ¶ 1; ECF 33) Each count carries a maximum term of 10 years' imprisonment, except for the conspiracy count, which has a maximum term of 5 years. (PSR ¶¶ 1, 77; ECF 33)

On March 16, 2022, the defendant pleaded guilty to one count of false statement during purchase of firearms, (Count 5), and admitted to the relevant offense conduct for the conspiracy alleged in Count 2, in accord with a plea agreement filed with the Court. (PSR ¶¶ 2, 3; ECF 130, 133) The United States agreed that it would not advocate for a sentence greater than 78 months. (PSR ¶ 3; ECF 133, ¶ 7)

On June 1, 2022, the United States Probation Office issued its Final PSR, finding the defendant's total offense level to be 27 and his criminal history category to be II,[1] resulting in an effective advisory Guidelines' range of 78 to 97 months' imprisonment. (PSR ¶¶ 32, 47, 78) The PSR's Guidelines calculations did not differ from those of the plea agreement. (PSR ¶¶ 3, 78; ECF 133, ¶¶ 5.e., f.)

## ARGUMENT

In following the sentencing methodology laid out by the Supreme Court, "a district court should begin all sentencing proceedings by correctly calculating the applicable

---

[1] The PSR determined that the defendant had a total of two criminal history points. (PSR ¶¶ 46-47)

Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). "[A]fter giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Id.* at 49-50. Section 3553(a) requires the Court to consider a number of factors, including "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities." 18 U.S.C. § 3553(a). But a district court is not required to provide a mechanical recitation of the Section 3553(a) factors and "has wide latitude to weigh the § 3553(a) factors in each case and assign some factors greater weight than others in determining an appropriate sentence." *United States v. Wisecarver*, 911 F.3d 554, 557 (8th Cir. 2018); *United States v. Ballard*, 872 F.3d 883, 885 (8th Cir. 2017); *United States v. San-Miguel*, 634 F.3d 471, 475-76 (8th Cir. 2011).

### A.    The Guidelines Calculations

The United States agrees with the calculated total offense level of 27 and criminal history category of II, resulting in a Guidelines range of 78 to 97 months' imprisonment. For the following reasons, and in accord with the Plea Agreement, the United States advocates for a sentence of 78 months' imprisonment, as a sentence that is sufficient, but not greater than necessary, to comply with the purposes set forth in Section 3553(a)(2). The United States also advocates for a supervised-release term of three years, with conditions that include having the defendant and his premises and property subject to

5

search on reasonable suspicion of contraband or other violation of his supervised-release terms. The United States further advocates for a recommendation of the RDAP drug-treatment program and mental health assessment and treatment while the defendant is incarcerated with the BOP.

## B.   The 3553(a) Factors

A consideration of the 3553(a) factors warrants a sentence of 78 months' imprisonment.

### 1.   Nature and Circumstances of the Offense

While somewhat unsophisticated, the conspiracy was quite effective, resulting in the straw-purchasing of 95 firearms over a one-year period, and at least 65 firearms during the one-and-one-half-month period the defendant was involved in the conspiracy. These firearms that have entered the illicit black market of street-purchased and traded firearms—with no background checks, and no traces of the true purchaser. Given the exorbitant levels of significant gun violence being experienced throughout the Twin Cities metro area and around the country, the negative impact and contribution these firearms have in fueling that fire is patent. Only 18 firearms have been recovered. It can be reasonably inferred that the defendant and his co-defendants' straw-purchasing scheme significantly contributed to the cycle of violence, and they therefore must be held to account for their crimes. There can be no doubt that straw-purchasing firearms is a very serious crime—allowing otherwise prohibited persons—often because of prior felony convictions, drug addiction, or being a domestic abuser—to avoid national background checks and obtain a deadly weapon with impunity.

6

While the defendant's criminal history is relatively minimal, he must still be held accountable for his knowingly committed crimes—especially given the magnitude of the simple, yet unfortunately effective, scheme that injected at least 65 illegal firearms into the streets in the short one-and-one-half-month period the defendant participated. Moreover, the defendant perpetuated the damage by admittedly knowingly selling the straw-purchased firearms to known felons and drug users / suppliers. The defendant, however, was (at first) apparently not concerned with these troubling aspects, telling agents that he "did not care" that the straw-purchased guns were knowingly being provided to felons or being used in crimes, (PSR ¶ 13), and noting to his co-defendants that he was just trying to make them some money, (PSR ¶ 15). To the defendant's credit, however, he provided a full confession during a Miranda interview and has now accepted responsibility.

2.      History and Characteristics of the Defendant

The United States submits that the PSR accurately and adequately describes the defendant's criminal history, personal history, and characteristics. Although only 22 years old, the defendant has a significant juvenile history, beginning when he was only 14 years old. The defendant also has firearm-related offenses, including a misdemeanor fifth-degree assault in which he brandished a firearm to the victim and was trespassing at a battered women's shelter. (PSR ¶¶ 40, 44) The bond report also noted a history of warrants and failures-to-appear for court proceedings. (ECF 22, ¶ 4) Though having been previously charged with felony offenses, the present offense represents his first felony conviction.

The defendant also has a recent assessment of mental and emotional health issues, with a recommendation of inpatient mental health and substance abuse programming.

(PSR ¶ 61)  The defendant further has a significant history of daily marijuana abuse, which began when he was only 11 years old and continues whenever he is out of custody.  (PSR ¶ 65)  Indeed, the defendant told investigators that he was exchanging some of the straw-purchased firearms for high-grade marijuana from his supplier.  (PSR ¶ 13)  The defendant also abused promethazine and codeine, commonly known as "lean," for several years, (PSR ¶ 65), abused Xanax for several years, and has experimented with ecstasy, heroin, and psilocybin mushrooms laced with PCP, (PSR ¶ 66).

No doubt the defendant could benefit from structured programming and educational opportunities, substance abuse treatment, and mental health treatment while incarcerated at BOP and when placed on supervised released.  The defendant appears to be at a significant cross-roads in his life, with two possible yet quite divergent paths.  It is hoped that he will obtain the necessary assessment and treatment he needs, accept sobriety and lawful behavior, be successful on supervised release following his release from BOP, and become a productive member of society—leaving the path of crime and addiction.

3.      Needs of Sentencing and Other 3553(a) Factors

A sentence of 78 months is also warranted by the needs of sentencing and other § 3553(a) factors.  While certainly some mitigating factors exist, such as the defendant's struggle with school, somewhat dysfunctional upbringing, lack of a father figure during his formative years, and the family's struggles with poverty, the defendant recently obtained his GED, reported a safe home throughout his childhood, with nutritional needs met, and a strong supportive relationship with his mother and two siblings.  (PSR ¶¶ 55-57, 68)   But aggravating factors also warrant consideration such as the very serious nature of the offense

and the incredibly negative impact the offense has very likely had on the skyrocketing levels of gun violence experienced over the last year.  A sentence of 78 months will provide adequate deterrence for the defendant as an individual, and to others by showing that straw purchasing firearms is a serious felony crime.  *See Ferguson v. United States*, 623 F.3d 627, 632 (8th Cir. 2010) ("Congress specifically made general deterrence an appropriate consideration . . . and [the Eighth Circuit has] described it as 'one of the key purposes of sentencing.'") (quoting *United States v. Medearis*, 451 F.3d 918, 920 (8th Cir. 2006)).

On balance, a sentence of 78 months would serve the needs of sentencing to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to avoid unwarranted sentencing disparities among defendants.

## CONCLUSION

For all the foregoing reasons, the United States respectfully recommends that the Court impose a sentence of 78 months' imprisonment and a three-year term of supervised release, including conditions of substance abuse treatment, mental health treatment, and requiring the defendant and his residence be subject to search upon reasonable suspicion of contraband or other supervised-release violation.

Respectfully submitted,

Dated:  June 15, 2022

ANDREW M. LUGER
United States Attorney

*/s/ Benjamin Bejar*

BY:  BENJAMIN BEJAR
Assistant United States Attorney
Attorney ID No. 351131